H. HOLMES ET AL., Respondents, v. H. F. HARRINGTON ET AL., Appellants.

$\begin{vmatrix} 20a & 661 \\ 31a & 208 \end{vmatrix}$

### St. Louis Court of Appeals, February 9, 1886.

1. MERCANTILE AGENCIES—JUDICIAL NOTICE.—Courts will take judicial notice that mercantile agencies collect information concerning the financial condition of persons in business and communicate the same to business men, on application.

2. —— EVIDENCE — CONTRACTS — FRAUD — AGENCY.—A person who makes a statement of his financial condition to a mercantile agency, which statement is communicated to a third person, who, on the faith thereof, gives credit to such person, incurs the same liability to such third person that he would have incurred had he made the statement directly to him.

3. —— PRESUMPTIONS.—Reports of mercantile agencies are binding on the person who makes them to the agency, on the ground that they are presumed to have been made with the intention of having them reported to the business world, and, hence, to the merchant seller.

4. —— SALES.—A mercantile report made up of statements of the person whose condition is reported, of deductions of the reporter,

and of information derived from other sources, will not enable the seller who gave credit on the faith of the report as a whole, to avoid the sale on the ground that the report was false and that the sale was induced by fraud, unless the statement made by the purchaser was false and formed a material inducement to the giving of the credit.

5. ——— PRACTICE.—A mercantile agency not having reported, as made, any statement of the purchaser which was false, as to his condition, the case is improperly submitted to the jury on the question of false and fraudulent statements inducing the sale.

APPEAL from the St. Louis Circuit Court, DANIEL DILLON, Judge.

*Reversed and remanded.*

A. BINSWANGER, for the appellants : Replevin is the proper remedy to recover specific property. *Herdic v. Young*, 55 Pa. St. 176 ; *Mennie v. Blake*, 6 Ell. & B. (88 E. C. L.) 849 ; *Hutchinson v. McClellin*, 2 Wis. 17 ; Wells on Replevin, sect. 38, p. 27. Plaintiffs, in their petition, failing to comply with section 3844, Revised Statutes of Missouri, and the property being in the sheriff's hands under writs of attachment, this suit can not be maintained. *Jordan v. Parker*, 56 Me. 557 ; *Dickson v. Culp*, 9 Baxt. (Tenn.) 57. The Commercial Agency's reports were not the reports of Leubrie Bros., and hence plaintiffs sold the goods to Leubrie Bros. on their own responsibility, and not on the strength of any false representations made by them. A party can not rescind a contract in part and affirm in part. He can not treat part of a contract as valid and rescind the rest. *Bishop v. Stewart*, 13 Nev. 25–41 ; *Cassidy v. Metcalf*, 66 Mo. 519 ; *Estes v. Reynolds*, 75 Mo. 565.

MILLS & FLITCRAFT, for the respondents : The action of replevin can be maintained in Missouri without filing an affidavit, and without giving bond. The authorities cited by defendants do not sustain their proposition, and the Missouri cases (*Gulath v. Waldstein*, 7 Mo. App. 69, 10 Mo. App. 586 ; *Eads v. Stephens*, 63 Mo. 92), are positive authority for the proceeding. The sheriff holding goods

under writs of attachment against the fraudulent vendee has no other or greater rights than the vendee himself. If the action could be maintained against the vendee it can be maintained against him. *Bidault v. Wales*, 20 Mo. 546; *Goodger v. Finn*, 10 Mo. App. 230, and cases cited; *Jordan v. Parker*, 56 Me. 557; *Donaldson v. Farwell*, 93 U. S. 63; *Landauer v. Cochran*, 54 Ga. 533; *Oswego Starch Factory v. Lendrum*, 57 Ia. 573. See, also, *Thomas v. Freligh*, 9 Mo. App. 151. The reports of the mercantile agency on information furnished by the Leubries were made for communication to the mercantile world, and plaintiffs had a right to rely upon them as fully as if made to themselves directly by Leubrie Bros. *Eaton v. Avery*, 83 N. Y. 31; *Genesee Co. Sav. Bank v. Mich. Barge Co.*, 52 Mich. 164; *Lindauer v. Hay*, 61 Ia. 664. Concealment of insolvency by a purchaser who obtains goods without intending to pay for them, is a fraud and the property does not pass. *Durell v. Haley*, 1 Paige, 492; s. c., 19 Am. Dec. 444; *Stewart v. Emerson*, 52 N. H. 301; *Chaffee v. Fort*, 2 Lans. 87. If purchaser has no reasonable expectation of being able to pay it is equivalent to an intention not to pay. *Talcott v. Henderson*, 31 Ohio St. 162; s. c., 27 Am. R. 501; *Powell v. Bradlee*, 9 Gill. & J. 220; *Johnson v. Monell*, 2 Abb. App. Dec. 470. Sale secured by fraudulent misrepresentations as to solvency works no change of property, although the fraud be not indictable. *Cary v. Hotailing*, 1 Hill, 311; *Nichols v. Michael*, 23 N. Y. 264; *Goulding v. Davidson*, 26 N. Y. 606.

THOMPSON, J., delivered the opinion of the court.

The plaintiffs are manufacturers of shirts, collars, and cuffs, at Troy, New York. The defendant Harrington, is the sheriff of the city of St. Louis. The defendant Hellman is the assignee for the benefit of creditors of the late mercantile firm of Leubrie Brothers, which did business in the city of St. Louis. In August or September, 1884, Leubrie Brothers gave an order to the plaintiffs for a lot of shirts. The plaintiffs

filled the order in installments, making, it seems, three shipments: one in October, one in November, and one in December. The Leubries paid for the first shipment on December 3, and sent a check for the second shipment on December 15, which check was not paid for the reason that, on December 19, several large creditors levied attachments upon their stock of goods, and they thereupon made an immediate assignment to the defendant Hellman, for the benefit of their creditors.

The plaintiffs proved up a claim before the assignee for a portion of the goods thus delivered and received a dividend thereon. For another portion, admitted to be of the value of $365.53, they brought this action of replevin against the defendant Harrington, who held the goods under the levies of the attachments, and the defendant Hellman was afterwards made a party, upon his own application. The plaintiffs found their claim of right to rescind the contract of sale, and recover the goods in this action, upon two contentions: 1. That Leubrie Brothers being, to their own knowledge, insolvent, bought the goods of the plaintiffs fraudulently, never intending to pay for them. 2. That Leubrie Brothers made certain false and fraudulent representations touching their capital and resources to the commercial agency of R. G. Dun & Co., which representations were communicated by R. G. Dun & Co., to the plaintiffs, upon the faith of which the plaintiffs sold the goods on credit to Leubrie Brothers.

I. Upon the first of these contentions of the plaintiffs, we shall content ourselves with observing that there was evidence sufficient to take the case to the jury, and that it seems to have been put to the jury upon proper and sufficient instructions.

II. But upon the second contention, we have come to the conclusion, after an attentive examination of the record, that there was no evidence to take the case to the jury. Upon this question the substantial evidence was, that in October, 1883, Mr. Barbee, who was the "reporter" at St. Louis for the mercantile agency of R. G. Dun & Co., called upon Leubrie Brothers, and requested a state-

ment of their financial condition. They merely referred him to their books, and from those books he drew off the following items : "That Ellis Leubrie was credited with $31,800 ; that Lou Leubrie was credited with $27,755.59 ; that they owned, unincumbered, an opera house in Memphis, Tennessee, of the value of $22,942 ; that they had made so far during that year, profits to the amount of $5,005.90 ; that their sales were $326,130 ; and that their stock on hand was about $92,000, taken at its value, and not at cost." They made no statement to Mr. Barbee touching the amount of their indebtedness. From these figures, Mr. Barbee constructed the following report of the financial condition of Leubrie Brothers, a copy of which was sent to various agencies of R. G. Dun & Co., including their agency at Troy, New York, where the plaintiffs did business :

"OCTOBER 18, 1883.

"LEUBRIE BROTHERS :

"Their fiscal year ended last March, and their books, which they have exhibited to us, show their condition to have been as follows : Ellis Leubrie's investment in the business, $31,800.30 ; Lou Leubrie's, $27,755.37 ; net profits for the year, $5,005,90 ; sales, $326,130 ; stock taken at value, net cash, $92,000 ; indebtedness, $32,455 ; claims to have made some money since then. They are at present carrying a stock of some $150,000, insured for $130,000. This would leave their indebtedness about $90,000. They also own a theater in Memphis, Tennessee, which stands them on their books, as shown us, $22,942, unincumbered ; leaving their total worth, clear, $82,497.67. The small amount of net gain on the year's business is readily explained in the usual expenses in opening a new business in a new field, their bills for advertising, etc., being very large. They expect to make more money this year. Are doing but little advertising, and have cut down their expenses largely. Their friends here have full confidence in them, and one local firm is willing to credit them for as high as $5,000 on usual time.

The liabilities are large in proportion to their capital ; but they are doing a large business, sell for cash, and their ability to meet their engagements is not doubted by those who ought to be best informed about their affairs. We are informed that Mr. Maurice (in one copy Maas) will shortly be admitted to the firm. He states that no definite arrangements are yet completed, and when he becomes a partner, notice of the change will be given. He has been here since last October. Has charge of the books and the office of the firm. Came from Memphis, Tennessee, where he was cashier of the Manhattan Bank. Parties here who know him well, say he will be a valuable acquisition to the firm. Is represented as a first-class business man of good character and reputation and estimated worth over $10,000. As to the amount he will invest he will not state, and we are unable to learn. When the change takes place, he promises a full statement in the matter."

It is perceived that this report contains on its face, contradictory statements, which a merchant might understand, but which I do not. It states in one place that their stock taken at value, net cash, is $92,000, and their indebtedness $32,455. Immediately thereafter it states that they are at present carrying a stock of some $150,000, and that this would leave their indebtedness about $90,000. It then states the item of their theater in Memphis, as shown, at $22,942, unincumbered ; and from these data, it figures out their total worth, clear, at $82,497. Now, Leubrie Brothers never stated to Mr. Barbee what their total indebtedness was, or what their total worth, clear, was. Each of these essential items was the result of his own figuring ; and, according to his own statements, his figuring was erroneous. He states that he arrived at what they were really worth, clear, by adding togther the individual amounts of their credits, and adding to this the amount set down as the value of their opera house. It is plain, and he admits it on cross-examination, that the value of the opera house should have been deducted from

the aggregate investment of the two partners, which would make a difference in their worth of about $45,000, which would make them worth less than half the amount stated in the above report. He got at their indebtedness by a process equally erroneous. Instead of deducting the amount of their joint investment, less the value of the opera house, from the sum of $150,000, the total value of their stock on hand, he merely deducted their aggregate investment (leaving the value of the opera house out of view) from the before mentioned sum, by which he arrived at the conclusion, roughly stated, that their indebtedness was about $90,000. The other process would have swelled their indebtedness by a sum equal to the stated value of the opera house.

Leubrie Brothers never made any other statement of their financial condition to R. G. Dun & Co. They promised to make one, but upon further consideration declined, alleging as a reason that they had been unfairly treated by some of the mercantile agencies. Nevertheless, one of their agents, Mr. Gorse, testified that he called on Leubrie Brothers in September, 1884, and requested a statement of Mr. Maas, their business manager and treasurer. He declined giving a statement, but, according to the testimony of Mr. Gorse, which Mr. Maas denies, stated that their indebtedness had decreased; that they had no bank liabilities, and that they owed nothing for borrowed money at the time. As the result of this interview and other information collected, R. G. Dun & Co. made a supplemental report concerning Leubrie Brothers, which was also communicated to these plaintiffs. It reads as follows:

"SEPTEMBER 10, 1884.

"Mr. Maas, the business manager of the firm, promised a statement of their affairs, on the return of Louis Leubrie from New York City. He now tells us that the firm have decided to make no statement whatever to the agencies in the future, on account of the unfair treatment that they have received at the hands of another

agency here within the past year. Positively declines any particulars, further than they have reduced their indebtedness materially, and now have no bank liability. Claims that they have no borrowed capital whatever in the business, and says that their business has been quite profitable. A prominent business man here, who is well acquainted with their affairs, and whose opinion is entitled to confidence, assures us that the Leubries, acting on his advice, have been reducing their liabilities to a minimum, and curtailing their business to admit of this. He says they have been doing too large a business for their capital, and, in consequence, have been owing very large sums. The statement they made last fall is considered a correct exhibit of their affairs according to their books. Though he estimates their worth in their business, at a very conservative valuation, at $40,000, and believes their property in Memphis to be worth the amount claimed. This property originally cost a considerable sum, and the Leubries' purchase of same is regarded as advantageous. It brings an income of $5,000 annually. Without a statement from the firm we are unable to give further information."

Concerning the truthfulness of these reports it should be said that there was no evidence that the statements drawn from their books by Mr. Barbee touching the investments of the two partners, the ownership of the opera house, unincumbered, and its value, were not true. At the time of their failure, which took place on December 19, 1884, they had a stock of goods on hand of the cost value of about $250,000, and their indebtedness for goods was about $175,000, and for borrowed money about $65,-000, making a total indebtedness of $240,000. This, it will be perceived, was about three months and nine days after the alleged statement of their affairs by Mr. Maas to Mr. Gorse.

Applying the law to to the foregoing facts, we do not doubt the soundness of the proposition that the so-called mercantile agencies have become such well recognized instruments of commerce that the courts may take judicial notice of the fact, well known by the whole business com-

munity throughout the country, that their principal office is to collect information concerning the financial standing of merchants and other business men, to be communicated upon request to other merchants or business men who may have occasion to extend credit to a customer. *Eat. on v. Avery*, 83 N. Y. 31. Nor do we doubt the proposition that, since a merchant or business man who makes statements to such a mercantile agency touching his financial standing, does so with the knowledge that the purpose for which the agency obtains this information is to communicate it to other merchants or business men from whom the former may solicit credit, the merchant so giving the information to the agency occupies precisely the same position in law towards any one who is deceived thereby into giving him credit, as though he had made the communication to such customer direct. *Eaton v. Avery*, 83 N. Y. 31, *Genesee County Savings Bank v. Mich. Barge Co.*, 52 Mich. 164; *Lindauer v. Hay*, 61 Iowa, 664. The governing principle in cases of this kind is that a person who makes a false statement for the purpose of deceiving and entrapping any one of a particular class of persons whom it may catch, is responsible for the consequences to any one whom it does catch. *Ayre's Case*, 25 Beavan, 513; *Wontner v. Shairp*, 4 C. B. 404; *Davidson v. Tulloch*, 1 Macq. H. L. Cas. 783; s. c., 6 Jur. N. S. 543; *Bartholomew v. Bentley*, 15 Ohio, 659; *Cazeaux v. Mali*, 25 Barb. 578, 583; *Cross v. Sackett*, 2 Bosw. 618; *Clarke v. Dickson*, 6 C. B. (N. S.) 453; *Bedford v. Bagshaw*, 4 Hurl. & N. 538; s. c., 29 L. J. (Exch.) 59; *Scott v. Dixon*, 29 L. J. (Exch.) 62 N.; *Morgan v. Skiddy*, 62 N. Y. 319.

But it is a principle equally well settled that the fraudulent representation which will enable the other contracting party to avoid the contract must have been a material inducement to the making of the contract. Lord Cranworth in *Western Bank of Scotland v. Addie*, L. R. 1 H. L. (Scotch) 145, 158. It must be what the civilians call *dolus dans locum contractui*. *Pulsford v. Richards*, 22 L. J. Ch. 559; s. c., 17 Jur. 865; 19 Eng. L. & Eq. 387.

This does not mean that it must have been the sole inducement to the making of the contract; but it must have been an efficient inducement operating upon the mind of the party who claims the rescission, although other influences may have been at work upon his mind at the same time. Lord Cranworth in *Nicol's Case,* 3 De Gex & J. 420 ; *Edgington v. Fitzmaurice,* 53 L. T. Rep. (N. S.) 369 ; s. c., 22 Cent. L. J.

And although nice discriminations can not be made as to the relative weight which false and truthful statements mingling together may have had upon the mind of the party induced to make the contract, yet it seems upon principle that it ought fairly to appear that if the false statements had been eliminated from the representations which were made to him, he probably would not have entered into the contract.

But where, as in this case, many representations were made at two different times, some of them emanating from the party who procures the contract, and others emanating from different sources, many of them true and some of them false, and the party who claims to have been deceived by them does not indicate in his testimony whether he was induced to enter into the contract by those which emanated from the other contracting party, or by those which emanated from other sources ; or whether he was influenced by those which are shown to have been true, or by those which are shown to have been false, no ground is afforded from which any conclusion can be drawn as to whether the false representations, which the evidence tends to show were in fact made by the other contracting party, were a material inducement to the making of the contract. Both of these plaintiffs testified as witnesses in the cause ; but neither of them stated upon which of the reports of R. G. Dun & Co. they relied, or upon what particular statements in either report they relied. Did they rely upon the statement in the first report that Leubrie Brothers were worth clear $82,492 ? The statement was the mere conclusion of R. G. Dun & Co., and was never made by Leubrie Brothers.

Did they rely upon the statement that the proximate indebtedness of Leubrie Brothers was $90,000 ? The same may be said of this statement. Did they rely upon the statement of their possession of unincumbered real estate of the value of $22,000, and the statement of the investments in the business of the two members of the firm and of their having made $5,000 during the preceding eight months of that year, notwithstanding the cost of advertising incident to the starting of business in a new place ? These statements are not shown to have been false. Did they rely upon the statement alleged to have been made by Mr. Maas in the September, 1884, interview, that they had reduced their indebtedness materially, and had no bank liability ? These statements are not shown to have been false at the time they were made. This leaves but one question — and it is the crucial question upon this record — did they rely upon the statement alleged to have been made by Mr. Maas in this last interview, that they had no borrowed capital whatever in the business, and that their business had been quite profitable ? - This was a material statement, and, if made, which Mr. Maas denies, was undoubtedly false. If they relied upon this statement, and if it formed a material inducement to their selling the goods to Leubrie Brothers on credit, undoubtedly they would have the option of rescinding the sale on discovering its falsity, and they ought to succeed in this action. But if they had relied upon it, they could have said so. Instead of saying so, they said this, and only this : "We sold and delivered these goods to Leubrie Brothers, relying on representations made to our agent as to their solvency and ability to pay for same." Representations made by whom ? By Leubrie Brothers, or by the merchants whose opinions R. G. Dun & Co. quote in each of the above reports ?

To specify further, it appears that no representations of fact were made by Leubrie Brothers in the interview of 1883, which were communicated by R. G. Dun & Co. to the plaintiffs, *as made*, which are shown to have been false. Nevertheless, the court, in the fifth instruction

given for the plaintiffs, allows the jury to find for the plaintiffs upon the hypothesis of false representations made in 1883, which induced the giving of the credit. This was error, even assuming that there was evidence sufficient to take the general question to the jury, and we hold that there was not.

The judgment is reversed and the cause remanded. Rombauer, J., concurs. Lewis, P. J., dissents.

Dissenting opinion by LEWIS, P. J.

I respectfully dissent from the legal conclusions of my learned associates, as well as from their reading of the testimony in this record, and from their arithmetic. As to the second issue described in the majority opinion, it is clear to my mind that there was ample testimony to take it to the jury; that the instructions relating to it were apt and correct, and that the finding of the jury ought not to be disturbed.

My learned associates find fault with the arithmetical deductions, or inferences, of the witness Barbee and of the mercantile agency report, from the facts and figures furnished by the debtors. They seem to suppose that those deductions were improperly treated as facts for which the debtors were held responsible in the verdict, and they find further that the deductions are, in themselves, erroneous and incongruous. As to the first objection, it is completely answered by an instruction which was given. The jury were told by the court that they were "not bound by the opinion of witnesses as to any fact in issue in this trial, but are to determine such fact for themselves." Every deduction or inference in the testimony is squarely presented as derived by the utterer from facts appearing, and not as a fact or averment coming from the debtors. The jurors were competent, as juries always are, to accept the same deductions, or to adopt others of their own, if found less questionable. As to the supposed errors and incongruities, they all disappear before such a fair and reasonable understanding of the testimony, as the majority opinion

escapes. Thus, it is discovered that the witness Barbee, reporter for the mercantile agency, made a series of gross miscalculations, all resulting from his mistakenly adding the value of the Memphis opera house to the business capital of the Leubries, instead of subtracting it therefrom ; "which," as the opinion explains, "would make a difference in their worth of about $45,000." The error is in the majority opinion.

The whole issue in connection with Barbee's testimony at this point is, not what was the actual financial condition of the Leubries ; but what, in their interview with the reporter, *did they represent it to be ?* The truth of their representations in this and similar interviews, is the whole matter of controversy in the case.

It is perfectly clear that, if the opera house property was purchased and paid for out of the mercantile capital, or even its proceeds, its value, or its purchase price, would be properly chargeable against the capital, and in diminution thereof, in order to ascertain the actual holdings of the firm ; since they could not thus expend the value, and still claim to hold it. But if the property had been acquired from a different source and by other means, so that it was a holding *in addition* to the mercantile capital invested, the same value would appear as an increment of the firm's wealth, and there would be no shadow of propriety in charging it against the capital. If, therefore, the debtors told the reporter that the real property was additional to their mercantile capital and independent of it, when, in fact, it was drawn from that capital and, therefore, chargeable against it, they falsely represented themselves to the reporter as richer, by about $45,000, than they really were, and as by so much the more entitled to credit in the mercantile world. Testimony to this effect was directly pertinent to the issue, and was proper to be submitted to the jury.

It appears in the testimony that Lou Leubrie, one of the members of the firm, and Maas, the business manager, were the persons who gave information to Barbee about the condition of the firm. Barbee testifies that

they not only referred him to their books, but they "read off" to him the figures he obtained. "I could not say that I read them out; but they were both there, and gave them out to me." "Q. Then you took the figures and set them down as they called them off. Does that express the idea? A. Yes, sir." He thereupon shows that all the statements made about the opera house were to the effect that it was a separate holding *in addition* to the cash capital put into the business by the brothers. After giving the amount contributed by each, he continues: "*Besides that*, they had real estate, an opera house in Memphis, Tennessee." They told him that this was unincumbered, and that it was worth $22,942. A question may naturally arise here: What possible reason existed for going into these details about the opera house, if its value was only a constituent element of the capital invested? What reason could exist, but an intention to have it understood that the firm held an unincumbered property additional to the cash capital already particularly itemized and described? But, aside from speculative inquiries, the testimony that such was the intention is sufficiently direct and convincing. Barbee was the only witness who described what was said to him on this point. Louis Leubrie and Maas both testified for the defence, but neither had anything to say on that particular matter. Barbee, throughout a long and harrassing cross-examination, maintained that the impression distinctly conveyed to him by his informers, in every phase of their interview, was, that the opera house was separate property, and additional to the capital invested of $59,555.67. He showed that his own estimates, made at the time, were solely on that basis, and that the same estimates, with the method of making them, were followed up in the mercantile agency report. Was his understanding of the story told him a mistaken one? That was a question for the jury, and this court has no right to weigh the testimony against the verdict. But there is no evidence of mistake: "Q. Then they *also*

had capital in real estate? A. Yes, sir. Q. Which you credited to their account? A. I gave them credit for owning it. Q. Why did you add that to their $59,-000 of capital? A. I added it in to see what they were worth. * * * The real estate was entirely separate. * * * This real estate was in addition to their capital. * * * They told me it was clear and entirely separate. * * * They told me it was separate, and they showed me that amount as being part of their credit; a part of what they had invested in their business. * * * I understood them to say it was extra. Q. * * * Then it might be your error in getting the figures, instead of theirs? A. No, sir. They told me they had that amount invested in the company, and it was credited on their individual account as being the amount they had invested in the business." The witness made several other emphatic declarations to like effect. As generally happens in skilful cross-examinations, the witness was occasionally entrapped into an affirmative or negative answer that appeared to be inconsistent with the drift of his story. But, when further pressed, he invariably adhered to his first account; thus showing that he had misapprehended some of the questions. The majority opinion, however, finds that this witness admitted on cross-examination, "that the value of the opera house should have been deducted from the aggregate investment of the two partners." This admission, if made, would only show the falseness of the Leubries' representation to the contrary. But the nearest approach to such an admission that I can find in the record, is contained in the following extract from Barbee's cross-examination: "Q. If the capital account was credited with $59,000, and charged with real estate $22,000, then it should be deducted from the capital account? A. *I did not figure it that way.* Q. Then this mistake arose in your mind in getting them charged with more capital than they were entitled to? A. Well, that might be so." I confess my inability to find in all this, anything more than an admission of what *might be* the result, if

a certain hypothesis of facts were true, which the witness earnestly protests was not true. He has been all along insisting that he never did "charge" the real estate against the capital account; but that he always understood and treated it, from the information given him, as a credit, wholly independent of the cash capital account. It is a common device of expert counsel in cross-examination, to assume that the witness has committed a mistake, whether in fact he has or not.

Mr. Maas, a brother-in-law of the Leubries, and their business manager, testified that the opera house value was "to be charged" against the credits for capital, and that this was necessary in order to make the books balance. This means, of course, that the property was not additional to the cash capital, but was so much taken out of it. Compare this with the information given, and reiterated in various verbal forms, to Barbee, for transmission to the mercantile world. It shows a clear difference of forty-five thousand dollars between the representation and the fact. Why was not this a case for submission to the jury? Might not both witnesses be believed? That the jury did believe both is apparent from their verdict; and yet that verdict is to be here set aside, because on this very issue there was no evidence in support of the plaintiff's case!

All the supposed errors, contradictions, and incongruities, charged in the majority opinion against Barbee and the agency report, are a direct result of this curious misapplication of the testimony. Barbee is represented as giving the actual state of the Leubries' finances, when he is only repeating their misleading accounts of it. From the standpoint on which he was placed by the information given him, his estimates and deductions are correct and consistent, in every particular. But the majority opinion transfers him bodily to a different one, and from this false position enlarges upon contradictions and incongruities of its own evolution. The instance here dwelt upon is not the only one in the learned majority opinion of a misapplication of the

figures given in the testimony, as I understand them.
I will not occupy space with further illustrations, but
will endeavor, briefly, to summarize the conclusions
which the figures indicate to me, and which they evi-
dently indicated to the jury.                                    ＼

Barbee's testimony on the trial corresponds gener-
ally with the agency report, which was also given in
evidence. The testimony, in this two-fold form covers
three financial periods: (1) The end of the Leubries'
fiscal year, in March, 1883. (2) The date of the first
report, October 18, 1883. (3) The visit of Gorse, a
second agency reporter, in September, 1884. The fig-
ures will not be here stated in the order adopted by the
reports; since those papers are wholly innocent of pre-
cision in logical arrangement. For the first period, it is
made to appear that the brothers are credited with an
aggregated cash capital of $59,555.67, and "besides
that," an opera house worth $22,942; making a total of
$82,497.67, which is given in these exact figures as the
total worth of the firm.

The stock on hand is stated at $92,000. The indebt-
edness of the firm is given, not as a fact directly im-
parted to the reporter, but as his deduction from the
ascertained figures, with the process whereby that is
reached. The amount of cash put into the business is
subtracted from the value of the stock on hand, and the
remainder shows the indebtedness. This is a logical,
inevitable, and utterly harmless "deduction." It is
quite as much so as would be that of the witness, who,
testifying that he saw two horses, and afterwards saw
two more, should venture upon the deduction that there
were four in all. It is certain that, if a man goes into
business with $50,000 in money, and lays in a stock of
$100,000, he must have become a debtor for the extra
$50,000; in other words, for the excess over his ca-
pacity to buy for cash. Some additional facts were
here furnished: as that sales for the preceding year had
amounted to $326,130.00, and net profits to $5,005.90.
For the second period, it is reported that the Leubries

are "at present," October 18,1883, carrying a stock of some $150,000. Here a deduction is made of the firm's indebtedness, at "about $90,000." The majority opinion finds this result contradictory and inexplicable. A right reading of the figures make it perfectly simple and satisfactory. Thus, if, as before, we subtract the cash invested, or $59,555.67 from the stock on hand, or $150,-000, there will remain $90,444.33, or *about* $90,000 for indebtedness, as stated.

For the third period, no exact figures are given, but material information was imparted to a second reporter by the business manager of the firm. "Their indebtedness had decreased; that they had no bank liabilities, and that they owed nothing for borrowed money at that time. The business had been profitable. That a year before, they owed the bank about $25,000, and that now they didn't owe the bank anything. Their indebtedness, which was quite large a year or so ago, was materially reduced." This was in September, 1884.

The testimony altogether, presents an array of well defined facts, figures, and information, derived from the debtors themselves, and having a direct bearing upon their financial condition, and their title to mercantile credit. The same facts, figures, and information were communicated to the plaintiffs, as each of them testified, through the reports of the mercantile agency; and because of their reliance on the truthfulness of that information in its general details, they gave the credit which underlies this suit. Doubtless, some additional testimony crept in, that was irrelevant to the issues. But I am unable to perceive that any of this impaired, or modified in any way, the force of that which was relevant. The only question remaining is, whether there was sufficient testimony to take to the jury the issues upon the falseness of the information given by the debtors?

Within three months after the last statements obtained from the Leubries, which exhibited their condition as very much better than what appeared from the figures previously given, the real condition of the firm

was developed by the assignment and its sequences. It then appeared that the debts of the concern, as proved before the assignee and sued upon by attachments, amounted to $242,600, of which $65,000 was for money borrowed. The whole amount of assets realized from the assignee's and the sheriff's sales, was $108,500. There were estimates of the cost of the stock on hand, up to $250,000. But these estimates came from the Leubries and other interested persons, without an actual invoice. The substantial outcome left the condition of the Leubries about $133,000 worse than nothing.

In this expose of the true financial status, as compared with the figures and the facts given but a short time before to the agency reporters, was there nothing from which a jury might lawfully infer that those figures and facts could not, in the ordinary course of human affairs, have been truly given? I will not here undertake to demonstrate what such a comparison would prove, one way or the other. But I do insist that in such a comparison, there is an ample field of inquiry for submission to a jury, in addition to that furnished by the testimony about the opera house. The case went thus to the jury, with unexceptional instructions upon the issues involved; and I think, with all possible deference to my learned associates, that it is against precedent, and palpably against the demands of justice, to set the verdict at naught.

I am of opinion that the judgment of the circuit court ought to be affirmed.

### ON MOTION FOR RE-HEARING.

ROMBAUER, J., delivered the opinion of the court.

The motion filed herein overlooks a very obvious distinction. Statements made by a merchant to a commercial reporter, touching his solvency, are binding on the merchant, exclusively on the theory that they are presumed to be made for the purpose of being communicated to the commercial world, and, incidentally, to the

seller.   Their admissibility in evidence against the mer-
chant rests on this basis alone ; beyond this they are
mere hearsay. ·         •

When a commercial reporter, as in this case, con-
structs a statement of his own, founded partly on his in-
spection of the books of the merchant, partly on his
conversations with the merchant, partly on his own
unwarranted deductions from such conversations and
books, and partly on information derived from third
persons, the aggregate statement is in no sense a repre-
sentation made by the merchant of his own condition,
but is the reporter's representation of such condition.

In making this representation, the reporter acts as
agent of the seller, and not of the buyer.   If a report
thus constructed prove incorrect, in any particular, and
credit is given upon the faith of the report as a whole,
as was done in this case, the sale is not avoided for
fraud, even though part of the statements made by the
merchant to the reporter prove untrue, unless it distinctly
appears that the statements made by the merchant him-
self to the reporter, formed a material inducement to
the extension of the credit.   Any other holding would
place the merchant at the mercy of a careless or unscru-
pulous reporter.

The question in this case, therefore, was not as the
motion assumes, one affecting the weight of the evidence,
but was one affecting the failure of proof; and, while
the instruction of the court on this branch of the case
was correct, in the abstract, it was not warranted by the
testimony.

A re-hearing is denied. Thompson, J., concurs ; Lewis,
P. J., dissents.