MARTIN R. COOK *et al.*, Defendants in Error, v. HENRY F. HARRINGTON *et al.*, Plaintiffs in Error.

31a 199
31a 394

St. Louis Court of Appeals, May 22, 1888.

1. PRACTICE—READING PART OF DEPOSITION.—Where an exhibit attached to a deposition contains two commercial agency reports, both of which are referred to by the deponents, it is error for the court to permit the party offering the deposition to read to the jury one of the reports only, against the objection of the adverse party.

2. EVIDENCE—CREDIT GIVEN ON FALSE REPRESENTATIONS.—In a case where the plaintiff claims a recovery on the ground that he was induced to give credit in a sale of goods by false representations of the purchaser's financial condition, it is necessary for him to prove both that the credit was induced by the representations, and that these were untrue. Hence, if there is evidence tending to show that the plaintiff was induced to give the credit by the reports of two different commercial agencies, it is prejudicial error to submit to the jury one of the reports without the other, since the one withheld may have constituted the controlling inducement with the plaintiff, and its statements may have been true.

Error to the St. Louis Circuit Court, Hon. Shepard Barclay, Judge.

*Reversed and remanded.*

David Goldsmith, for the plaintiffs in error: The statement charged to have been made by Mr. Endres to Mr. Tuttle differs materially from the report of that statement made to plaintiffs by Bradstreet's mercantile agency, at New York. The alleged statement constitutes but a portion of the said report and the evidence that plaintiffs made the sale of the property in controversy upon the faith of the two agency reports, received by them, as an entirety, not only does not support, but it is at variance with, the claim that the sale was made upon the faith of the alleged statement. The alleged statement of Mr. Endres was not reported as made, and, therefore, furnishes no ground for rescission. The statement made, according to the testimony of Mr. Tuttle, was that Mr. Endres had a capital of twenty thousand dollars in business; the statement reported was that Mr. Endres had a net capital of twenty thousand dollars. The two statements are substantially different because the first does not, while the second does, necessarily imply that the assets of Mr. Endres in the aggregate exceeded his liabilities by the amount stated. In saying that he had a capital of a certain amount in the business, Mr. Endres may have intended to include, and would not have been guilty of fraudulent misrepresentation in including, the borrowed capital which he employed. The use of the term "capital" in that sense and in a statement made, as in the case at bar, to a mercantile agency, was held justifiable, or at all events was held to furnish no ground for the rescission of a contract of sale, in *Dieckerhoff v. Brown*, 2 Cent. Rep. 620. A statement by a vendee to a mercantile agency cannot be ground for the rescission of the contract of

sale, unless it be reported as made. *Holmes v. Harrington*, 20 Mo. App. 661. The evidence being that the sale was made upon the faith of the two agency reports, where is the possible basis, either in reason or within the purview of the ruling of this court, that it would not have been made but for one sentence in one ? And how could the jury reasonably answer the fifth and sixth interrogatories as they did; how could they be reasonably asked to do so, seeing that one of the two reports, upon the faith of which the sale was made, was not read to them, and they were not cognizant of its purport or of a single word therein ? The plaintiffs have altogether failed to show, either that they would not have made the sale if the alleged misrepresentation, for which Mr. Endres is responsible, were eliminated from the Bradstreet report, or whether they were induced to enter into the contract by the statements in the agency reports, "which emanated from the contracting party, or by those which emanated from other sources." And yet this court in the case referred to explicitly ruled that, in the absence of proof of both of these matters, there is no evidence that the sale was made upon the faith of the alleged misrepresentation. And the same would be true, if it could possibly be said under the evidence in this case that the sale by plaintiffs was made upon the faith of the Bradstreet report alone. There would even in that case be nothing to indicate whether the statement said to come from Mr. Endres had any weight, or whether the statement of the net worth of Mr. Endres, according to "authorities in a position to know," was not the most credited part of the report, or whether the fact that Mr. Endres enjoyed good credit and was prompt in payments was not,. after all, what the plaintiffs cared most for.

GEO. W. TAUSSIG, for the defendants in error: The statement of Endres to Tuttle was reported to Cook & Bernheimer as made, and was competent evidence. Mr. Tuttle testifies that immediately after his visit to Endres,

on the very same day, he made a written memorandum
of what occurred. That memorandum was affirmed by
him at the trial as an accurate report made at the time.
It is true that Mr. Tuttle, in his oral testimony, given at
the trial in 1887, some three years after the conversation,
repeats the statement of Endres, without the use of the
word "net." But he also affirms as correct in every
respect his written report. As a matter of fact, there is
no difference between "capital" and "net capital."
And in truth and in fact it is the same whether Mr.
Endres stated that his capital was twenty thousand dol-
lars, or that his net capital was twenty thousand dollars.
If he simply stated that his capital was twenty thousand
dollars, he thereby eliminated everything which was not
properly included under the sense of capital. If he said
that his net capital was twenty thousand dollars, he did
not intensify this assertion. "Capital signifies the actual
estate, whether in money or property, which is owned
by an individual or corporation." *People v. Commis-
sioners*, 23 N. Y. 192. "Capital is the fund upon which
it transacts its business, which would be liable to its
creditors." *International, etc., v. Commissioners*, 28
Barb. 318. The term capital (as of a banker) does not
include money borrowed temporarily in the course of
business, but only the property or funds of the banker
set apart for other uses. In *Bailey v. Clark*, 21 Wall.
284, the United States Supreme Court said : "It would
not satisfy the demands of common honesty if a man
engaged in business of any kind, being asked the
amount of capital employed in his business, should
include in his reply all the sums which in the conduct
of his business he had borrowed and had not yet repaid."

Peers, J., delivered the opinion of the court.

This is an action of replevin begun in the St.
Louis circuit court on the fifteenth day of April, 1885,
and involves the title to fourteen barrels of whiskey.
It seems that the whiskey in dispute was sold by the
plaintiffs to George F. Endres & Company, in March,

1885, upon certain representations made by them as to their financial condition. When the whiskey arrived in St. Louis it was levied upon by defendant Harrington, the sheriff of the city, on an execution in favor of one Hartman to satisfy a judgment against George F. Endres & Company. The whiskey was replevied by the plaintiffs, who contend that the sale was voidable on their part, on the ground (1) because the purchaser bought with the intention of never paying for the property, and (2) because the goods were sold on the faith of material misrepresentations made by the purchasers.

The case was tried by a jury on special issues framed by the court bearing on these two questions of fact, and resulted in a verdict and judgment for the plaintiffs.

The question presented here, and about which the only contention is made, relates to the issue as to the alleged misrepresentations and their effect.

· The record shows that prior to September, 1884, George F. Endres carried on business under the name and style of George F. Endres & Company, but that at the date mentioned he took one Leo Scheben into the firm without changing the firm's name, and that shortly thereafter one Tuttle, an employe of Bradstreet's mercantile agency, called upon and had an interview with him. At that time Endres was doing business on a borrowed capital of about eighteen thousand dollars, and he had been doing so for a number of years, during all of which he met his obligations promptly and at maturity; but, counting these eighteen thousand dollars as liabilities, as they were in reality, the assets of Endres were in the aggregate somewhat less than his liabilities during all these years. Scheben contributed no capital to the firm, in fact he had none, he having been taken into the firm on account of his supposed ability as a salesman.

The evidence is conflicting as to the nature of the interview above mentioned between Tuttle and Endres.

Endres testified that he merely stated that the admission of Scheben had not made any change in the pecuniary condition of the firm, but that everything remained as before, and that Scheben had been admitted into the firm only on account of his salesmanship, but had not contributed any capital.

Tuttle admits the correctness of this statement, in so far as it refers to Scheben's condition and the reason for his admission, but adds that Endres also said that he had a capital of twenty thousand dollars, in business. Tuttle further testified that he thereupon constructed for Bradstreet's mercantile agency the following report :

"Sept. 27, '84. Geo. F. Endres and Leo Scheben commenced as above Sept., 1884, succeeding Geo. F. Endres & Co. E. is about forty-five years old and married ; he had been engaged in business on his own account except one year, for many years. The business during his early years showed evidence of considerable activity, but of late years said to have retrograded to some extent ; prospects at present appear better, however. Mr. E. states his net capital amounts to 20 M., and authorities in a position to know allow him a net worth of 15 M. He enjoys good credit and prompt in payments.

" L. S. his partner said to have contributed no capital to the concern ; he was formerly city salesman for Charles Wezler and is considered a good one, well regarded but believed possessed of limited means. His connection with the firm adds no financial strength.

"( Brad.)"

There is evidence tending to show that this report was forwarded to New York, where the plaintiffs did business. The plaintiffs were subscribers to two mercantile agencies, Bradstreet and Dun & Company, and thereupon having obtained a report upon the firm from Bradstreet, as above set out, also received the following report from Dun & Company :

"Oct. 21st, '84. Geo. F. Endres and Leo Scheben compose the firm. The latter admitted as a partner

Sept. 6, '84. It is generally understood that they employ about 30 m. in business. S. was for several years in the employ of other parties here, and represented to be a first-class salesman; has been made a partner of E. mainly on account of his ability in that direction. It is claimed that he has about 5 M. in cash, and that is all, although his wife has some resources. This capital, however, S. does not put into his business at present, it being claimed they have sufficient means to conduct the business. S. has been here for several years. They claim to be buying for cash and to discount their bills, and in good credit and standing.

"DUN & Co."

Each of the reports thus obtained was copied into a book kept for that purpose by the plaintiffs. Subsequently, in March, 1885, plaintiffs received an order from Geo. F. Endres & Company, a second order, which included the goods in controversy. Thereupon, one Reuther, the credit clerk of plaintiffs, consulted Mr. Cook, one of the plaintiffs, and they looked at the copies of said agency reports, and on the strength thereof shipped the goods in controversy.

The testimony of the credit clerk on this matter was as follows:

"My name is Leopold Reuther, aged thirty-eight years; I reside at 262 West 132d street, New York, and I am by occupation credit clerk to the firm of Cook & Bernheimer.

Q. "Were you in the employ of plaintiffs' firm as credit clerk in 1884 and 1885?

A. "I was.

Q. "Are you acquainted with Geo. F. Endres and Leo Scheben, or the firm of Geo. F. Endres & Company, of St. Louis, Missouri?

A. "I know them from purchases made from our house of Cook & Bernheimer. I am personally acquainted with Mr. Scheben, and became acquainted with him in 1885.

Q. "Did the firm have any dealings with him in

·the year 1884 ?    If so, when was the first transaction of that year ?

A.    "We had no dealings with him in that year prior to November 28, 1884.   On November 28, 1884, we filled an order forwarded to Cook & Bernheimer November 26, 1884.

Q.   ·  " What was done after the receipt of the order by Cook & Bernheimer ?

A.    "The order was placed in my care, and, finding that we had not done any business with Geo. F. Endres & Company for nearly a year and a half, I ordered one of my clerks, George F. Mansfield, to get a report, and I procured a report from the agencies, R. G. Dun & Company and Bradstreet & Company as to the financial standing of Geo. F. Endres & Company.

Q.    " And receiving these reports, what did you do ?

A.    "I read the reports through and finding therein statements satisfactory, especially a statement made by themselves, and acting upon these reports on the part of plaintiffs, I filled the order.

Q.    " And when were the goods shipped ?

A.    "November 28, 1884, the date of the bill.

Q.    " What became of the report you received from Bradstreet's ?

A.    "They were entered into our reference book, copied into our reference book.

Q.    " What page were they entered in your reference book ?

A.    "On page 309 of plaintiffs' reference book, marked ' F '.

Q.    "Do you know in which manner or shape this report was given to you by the agency ?

A.    "It came on the pencil slips which I read, and which were afterwards copied into this reference book.

Q.    " What were done or became of the original pencil slips ?

A.    "The original pencil slips were destroyed as soon as they were copied in the reference book.

Q. "Did the plaintiffs receive any further orders for goods from Geo. F. Endres & Company? If so, when and for what goods?

A. "Fifteen barrels of Mayfield whiskey —. This order was filled March 9, 1885, and amounted to $940.86.

Q. "What did you do on receipt of the order for these goods?

A. "Read them and looked at the account of Geo. F. Endres & Company, in our ledger, and finding that the purchase of November had not matured, and that Messrs. Geo. F. Endres & Company's account would be considerably more than at any time previous, I went back to the reports of agencies, testified to before, on page 309 of our reference book, read them over with Mr. M. R. Cook, and finally consented to pass the bill and send the goods upon the strength of the reports.

Q. "Did you believe these reports to be true?

A. "I did.

Q. "Did you send the last bill of goods on the strength and credit of these representations?

A. "I did.

Q. "And upon the strength of these alone?

A. "I did.

Q. "Had you at that time any other knowledge or information as to the means or standing of the firm of George F. Endres & Company?

A. "None whatever.

Q. "In your capacity of credit clerk, and in deciding whether credit should be given to intending purchasers, do you consult with Mr. Cook before giving credit to such purchasers?

A. "I pass most credits without consulting Mr. Cook. Only consult him in credits or matters of importance.

Q. "Did you consult Mr. Cook in this instance?

A. "I did.

Q. "Are these fifteen barrels of whiskey the subject-matter of this suit.

A. "They are."

It is evident from the foregoing recital that there was substantial evidence before the jury that the goods were sold and the credit extended on the faith of the commercial agency reports. The representations of Endres as to his capital formed part of one of these reports and was found by the jury to be untrue. Thus it results that if both of the agency reports had been introduced by plaintiff the jury would have been in a position to determine whether the representations of Endres, which formed part of one of them, formed a material inducement to the sale. The finding of this fact was essential to their verdict under the decision of this court in *Holmes v. Harrington*, 20 Mo. App. 661, and under the decision of the Supreme Court in *Anderson v. McPike*, 86 Mo. 300. The defendants' first substantial complaint arises upon the rulings of the trial court on the admission in evidence of one of these reports only.

The two commercial agency reports were contained in a paper marked "exhibit A," attached to plaintiffs' depositions. The plaintiffs and their credit clerk in testifying, frequently referred to both, so that there can be no controversy touching the point that they were relevant parts of their testimony, and that their evidence was to a great extent unintelligible and incomplete unless supplemented by these two reports. After other portions of said depositions were read, the plaintiffs offered to read, as part thereof, so much of said "exhibit A," as contained the Bradstreet commercial agency report. To this the defendants objected, insisting that the whole "exhibit A" should be offered by plaintiffs. This objection the court overruled and the defendant excepted. The plaintiffs thereupon read such parts of "exhibit A" only as contained the commercial report of Bradstreet.

This ruling of the court was erroneous. Both commercial reports formed integral parts of nearly all the depositions read by plaintiffs; both were relevant to the issues, and plaintiff was bound to read them both unless

we are prepared to hold that a party, in reading a deposition taken on his own behalf, may read such portions thereof as suit him and omit the remainder.

In *Hill v. Sturgeon*, 28 Mo. 329, where the same point was considered, the Supreme Court say : "If it is intended to present the point whether a party can read to the jury only such portions of a deposition as suit him, we say that when either party offers to read a deposition which has been taken in the cause, he must read all of it, except, of course, such parts as are decided by the court to be incompetent."

There is some conflict of ruling upon this point in other states, notably in *Gellatly v. Lowery*, 6 Bosw. 113, where WOODRUFF, J., uses this language : "A party who has caused such deposition to be taken does not necessarily, by offering parts of it in evidence, bind himself to read it all, or make answers which are irrelevant or incompetent, admissible." I have been unable to find any authority supporting this view, unless it be in *Forrest v. Forrest*, 6 Duer, 102, where the exact point is not decided, but where the language of the court may be construed into the meaning, as in *Gallanthy v. Lowery, supra*. We are, however, forced to the conclusion that the weight of authority is the other way. In *Ins. Co. v. Knight*, 6 Wharton, 327, 330, the judgment was reversed on the sole ground that the plaintiff was permitted against defendant's objection to read part of a deposition only. In that case SARGEANT, J., says : "It seems to be the same thing as striking out parts of the examination of a witness sworn in the case at bar, at the request of the party who called and examined him. This cannot be permitted. * * * When a deposition has been taken the party who offers it must read the whole. If parts of it be manifestly irrelevant they may on that ground be omitted under the direction of the court ; that, however, is not the privilege of the party, but the exercise of a duty by the

VOL. xxxi—14

court for the dispatch of business and saving of time and trouble."

But aside from what the courts of other states have held on this question, we feel that this court is bound by the law as laid down in *Hill v. Sturgeon, supra,* and we are not aware that the rule thus declared has ever been questioned in this state. In *Prewitt v. Martin,* 59 Mo. 325, and *Norris to use v. Brunswick,* 73 Mo. 258, it was held not to apply to a case where portions of a witness' previous deposition are read for the purpose of impeaching him. Such a case, however, is governed by different considerations.

It follows from the foregoing that the defendant was entitled to have the whole of "exhibit A" read to the jury, and the trial court erred in overruling his objection to the reading of part thereof without reading the whole. It further results that such error is clearly prejudicial, since the Dun report contained additional statements concerning the capital, credit, and solvency of Endres, and since the testimony is clear that credit was extended on the faith of both reports. The Dun report being excluded from the jury they could not intelligently determine whether Endres' statement as contained in the Bradstreet report was or was not a material inducement in extending the credit.

As the judgment must be reversed for this error, we deem it proper to make the following additional suggestions :

Defendants' counsel has argued *in extenso* that no part of the Bradstreet report consists of representations of Endres, since the alleged statement of his capital was not reported as made. That is to say, he reported according to the finding of the jury that he had so much capital, whereas the commercial report stated that he had so much *net* capital. The variation between the statement made and as reported is not, necessarily, wholly immaterial, as counsel for plaintiffs supposes. If the capital of Endres was borrowed on his private account and was in no sense a liability of the firm, and

yet constituted assets of the firm, the plaintiffs could not well be affected by the fact whether it was borrowed or not. No principle in the law of partnership is better settled than "that the creditor of a partnership has priority over the creditors of an individual member in respect to the funds of the partnership." *Phelps v. McNeely*, 66 Mo. 554; *Hilliken v. Francisco,* 65 Mo. 598; *Shackleford's Adm'r v. Clark,* 78 Mo. 493. This distinction should be kept in view by the court in submitting the case to the jury upon a retrial thereof, which necessarily results from the error committed by the trial court already mentioned.

With the concurrence of the other judges, the judgment will be reversed and the cause remanded.